## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

IN THE MATTER OF THE SEARCH OF
THE FOLLOWING LOCATION:

Information Associated with the Facebook
Account User URL:

www.facebook.com/LuiLu3232

No. 2:19-mj-319-JHR

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Kyle A. Kassa, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I am a 2004 graduate of the Maine Criminal Justice Academy's 7th Basic Law Enforcement Program and am employed as a Deputy Sheriff with the York County Sheriff's Office (Maine), and have been since November of 2005. Prior to that I was employed as a Patrolman with the Buxton Police Department. I am currently a Task Force Officer (TFO) assigned full time to the Federal Bureau of Investigation's Safe Streets Gang Task Force.

2.  In the course of my law enforcement training and experience, I have had an opportunity to search for, seize, and personally observe what I have recognized to be and what was later confirmed by drug analysis to be schedule drugs, including but not limited to heroin, fentanyl, methamphetamine, cocaine, marijuana (both dried and growing), crack cocaine, and various narcotics lawfully available only by prescription. I have conducted or participated in, among other things, surveillance, undercover transactions, debriefings of informants and confidential sources, and reviews of taped conversations relating to narcotics trafficking. I have assisted in many other investigations, both state and federal, to include investigations of crimes

1

of violence. I have drafted numerous search and arrest warrants and have assisted in the execution of numerous search and arrest warrants.

3.   I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation, from discussions with other agents of FBI and other law enforcement agencies, and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another FBI agent, law enforcement officer, or witness with knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

4.   I make this affidavit in support of an application for a search warrant for the following:

a.   Information associated with Facebook Account User ID www.facebook.com/LuiLu3232 that is stored at premises controlled by Facebook, a free-access social networking website, headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This search warrant, to be issued under 18 U.S.C. § 2703(a), (b)(1)(A) and (c)(1)(A), will require Facebook to disclose to the government copies of the stored information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section I of Attachment B.

5. Based on my training and experience and the facts as set forth in this affidavit, I submit that probable cause exists to believe that violations of 18 U.S.C. § 1951 (Hobbs Act robbery) and 18 U.S.C. § 924(c) (possession of a firearm during and in relation to a crime of violence) have been committed and that evidence of these offenses will be found in stored communications associated with Facebook Account User URL www.facebook.com/LuiLu3232. I further submit that there is probable cause to search for the information described in Attachment A.

## Showing of Probable Cause

6. In the early morning hours of August 3, 2019, York Police department received an emergency 911 call reporting a shooting at 3 Rowe Falls Lane, York, Maine.

7. When officers arrived, they encountered a male (later determined to be the homeowner) and two females in the garage area of the residence. The homeowner had been shot in the abdomen.

8. Law enforcement personnel were able to interview one of the females who stated that she had travelled to the residence with the homeowner and the homeowner's girlfriend. She indicated they had been out that evening and then returned to the residence in the same vehicle. She indicated that that they backed into the garage and the garage door started to close but then the door was re-opened. Two masked men entered the garage. One of the men became engaged in a physical altercation with the homeowner outside the vehicle. She went to assist the homeowner and as she was engaged in the altercation between the two men she heard a gunshot and saw that the homeowner had been shot in the abdominal area. The masked men then fled.

9. The homeowner had video and audio surveillance equipment installed at 3 Rowe Falls Lane. In the course of investigating the incident, I viewed surveillance footage and noted that

at approximately 12:26 A.M., two individuals slowly approach and enter the driveway. Both individuals appear masked and wearing gloves; one individual is carrying a backpack. Ten minutes later, the vehicle carrying the homeowner arrives at the home. Shortly after the vehicle arrives, a struggle is heard, followed by a single gunshot. At 12:36 A.M., both individuals flee down the driveway. One individual appears to be carrying a handgun, and neither person was wearing a backpack.

10. While processing the crime scene, investigators discovered a back pack believed to have been left by the suspects; the contents of the back pack indicated a likely robbery. The backpack contained one roll of duct tape, eleven plastic zip ties, and three white plastic bags.

11. The homeowner has told police that he is in the business of distributing marijuana.

12. Following the robbery/shooting, the victim's girlfriend was interviewed by law enforcement and the girlfriend indicated that she had an opportunity to observe the robber's skin. Based on the observed skin tone, the girlfriend believed that the suspect was possibly Hispanic.

13. Seven minutes after the 911 call reporting the robbery/shooting at Rowe Falls Lane on August 3, 2019, a York Police Department officer responding to the residence pulled over and staged on Mill Lane in order to await the arrival of additional officers before proceeding to the residence. Mill Lane leads to Rowe Falls Lane and is not a heavily traveled roadway, particularly at that time of night.

14. The York Police Department cruiser was equipped with a mobile license plate reader (LPR) which logs the registration plates of passing vehicles. At 12:46 A.M., the LPR affixed to the police cruiser logged a passing registration plate of New Hampshire 451 9827.

15. Investigators determined that the registration plate was affixed to a Nissan Rogue, registered to Luis M. Carpio (hereinafter "Carpio") of Manchester, New Hampshire.

16. During the early morning hours of August 3, 2019, investigators requested that officers with the Manchester Police Department make contact with the owner of the vehicle to ascertain the reason the vehicle was on Mill Lane in York near the time of the incident. Officers responded to Carpio's residence and determined the vehicle was not present.

17. I later obtained a criminal history maintained by the Manchester Police Department, which indicated they had arrested Carpio on several occasions; specifically on December 22, 2013 for two counts of armed robbery. The criminal history indicated that Carpio was convicted. This criminal history sheet indicated Carpio's phone number is (603) 674-8371 (hereinafter "Carpio Phone").

18. Through the subpoena process, I obtained subscriber information and toll records for the Carpio Phone. These records show that Sprint is the provider of Carpio Phone and that the listed subscriber is Yahindry Corona of 238 Pearl St. Apt. 3L in Manchester, NH. A law enforcement database indicated that Yahindry was Carpio's girlfriend at one time and he has a previous address at the same address. A review of call activity for the Carpio Phone reveals that the Carpio Phone was very active during the late night hours of August 2, 2019 and the early morning hours of August 3, 2019; however there was no activity between 12:19 A.M. and 1:12 A.M., the timeframe of the shooting/attempted robbery at 3 Rowe Falls Lane.

19. On August 20, 2019, I interviewed Luis Carpio at his residence in Manchester, New Hampshire. I explained to Carpio that law enforcement detected his vehicle being in the vicinity of the incident being investigated, and the purpose of the interview was to determine if Carpio was a witness to the incident and may have pertinent information and to ascertain the reason for his presence in the area. At the time of this interview, Carpio's Nissan Rogue, with New Hampshire registration 4519827 was parked in front of Carpio's residence.

20. Carpio was unable to provide any reason that his vehicle was in that vicinity on the early morning hours of August 3, 2019. Carpio stated he did not know anyone in York, Maine. Carpio appeared deep in thought, and in sum and in substance, stated that he had not been to the State of Maine in years. Carpio further denied being in the York, Maine area or any of the coastal Maine towns during the early morning hours of August 3, 2019.

21. Carpio stated that he lent his vehicle to a friend, who he did not immediately identify, over the weekend of August 3rd however not during the timeframe of the robbery. Carpio denied that anyone else had the vehicle over the weekend, and that he had left the keys in the vehicle after making arrangements with his friend to pick up the vehicle at Carpio's place of employment in Manchester, New Hampshire on the afternoon of August 3rd. Carpio stated that no one has free access to take his vehicle without his knowledge and none of his friends would steal it.

22. Carpio stated that he had lent the vehicle to Jason Santiago and provided a phone number for Santiago as (603) 716-6837. Santiago was reportedly living at the corner of Lake Ave. and Maple in Manchester, New Hampshire, and in response to a question from TFO Kassa, indicated that Santiago had a criminal history. Carpio stated that he had been at his place of employment during the week before, and had left his vehicle for Santiago to "scoop up" at his place of employment at 3:00 on Saturday August 3rd. I inquired if his vehicle was picked up at 3:00 A.M. or P.M., and Carpio clarified "in the afternoon." I pointed out that by that time he lent Santiago his vehicle, the vehicle had already been documented at the scene of the incident.

23. On September 19, 2019, law enforcement personnel interviewed a witness (hereinafter "WITNESS") who stated the following:

a) WITNESS is Carpio's partner.

b)     On the night of the robbery, Carpio lent a vehicle to an individual the WITNESS knew as "Candy."

c)     WITNESS does not know Candy's real name, but identified him as a dark skin male with tattoos on his back.

d)     WITNESS was present when Candy arrived to borrow the vehicle. WITNESS estimated that Candy picked up the vehicle around 9:00 P.M. – 10:00 P.M.

e)     WITNESS fell asleep after 11:00 P.M - 11:30 P.M.

f)     At approximately 6:00 A.M. the following morning, WITNESS woke up and went to the store. The vehicle was present at the apartment, however Candy was not. WITNESS entered the vehicle and noticed that the vehicle was in disarray; specifically there was mud all over the interior of the vehicle, there was a large black duffel bag in the back, as well as masks and white plastic zip ties. Following the discovery, WITNESS brought the vehicle to a car wash and cleaned the interior because WITNESS didn't want to be involved in whatever happened. WITNESS placed all the suspicious items together in the bag, placed it in the trunk of the vehicle and later discarded them in a dumpster.

g)     On August 30, 2019, Candy contacted and interacted with Carpio over Carpio's Facebook account. WITNESS indicated Carpio's Facebook account is under his actual name, Luis Carpio. WITNESS stated that Carpio has secret conversations and deletes his messages. WITNESS did not see the content of Carpio and Candy's conversation, but Carpio was typing. (On August 12, 2019, I preserved the electronic contents of this account. On September 19, 2019, I refreshed the preservation request with Facebook).

h)     Candy reportedly asked Carpio over Facebook to have WITNESS contact him because Candy wanted to know what WITNESS did with the items inside the vehicle. Carpio

told Candy that WITNESS threw it all away. Carpio gave WITNESS Candy's new phone new phone number and WITNESS sent Candy a text message shortly before her arrest.

i) WITNESS overheard the "whole story" of the robbery between Candy and Carpio. WITNESS overheard Candy talking about a male who lives far away in a beautiful house being shot in the shoulder, a screaming female, a garage, and Candy and another male she knows as "Sobo" running through the woods. (Note: these specific details closely align with how the actual events of the incident occurred).

24. An open source search for the Facebook account "Luis Carpio" revealed an account with the display name "Luis Carpio" with a URL of www.facebook.com/LuiLu3232. The profile picture shows a male and female who the undersigned knows to be Carpio and WITNESS.

25. As part of this investigation, I obtained cell site data the Carpio Phone. A preliminary analysis of the location data indicated that the Carpio Phone traveled to York/Kittery Maine and was interfacing with cellular towers servicing the 3 Rowe Falls Lane, York area at approximately 12:09 AM on August 2, 2019 and remained in the area until approximately 3:30 AM- 4:00 AM. The device then left the State of Maine and began traveling in the area of Route 101 towards Manchester, New Hampshire.

26. Officers with the Manchester Police Department are familiar with WITNESS and they believe WITNESS knows "Candy", and in fact Candy may be a co-conspirator in criminal conduct in which WITNESS engaged. Investigating officers believe that "Candy's" true name is Jason Candelario, and has documented ties to Manchester, New Hampshire.

27. I spoke with an investigator with the Canton, Massachusetts Police Department. The investigator provided me reports from the Canton Police Department detailing an armed home

8

invasion robbery that happened during the early morning hours of July 20, 2019 in Canton, Massachusetts. Three individuals entered the victim's residence in the middle of the night and restrained the victim with zip ties, threatened him with a firearm, and stole property including among other things, an estimated $17,000 in CBD products. Investigators subsequently arrested two of the suspects. Video of this incident was sent to investigators in Manchester and the investigators identified Jason Candelario, a/k/a "Candy", as one of the perpetrators. The investigators are familiar with Candelario because they have had numerous encounters with Candelario.

28. As part of this investigation, through court process I obtained historical cell site location for a phone number I believe is utilized by Jason Candelario, a/k/a Candy. Data subsequently provided by the cellular phone carrier indicates that Candelario's device also traveled from Manchester, New Hampshire to the vicinity of 3 Rowe Falls Lane in York, Maine on the night of the robbery.

## BACKGROUND CONCERNING FACEBOOK

29. Facebook owns and operates a free-access networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photos, videos, and other information with other Facebook users, and sometimes with the public. Facebook also allows users to privately instant message other Facebook users.

30. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook

9

security questions and answers (for password retrieval), physical address (including city, state and zip code), telephone numbers, screen names, websites, and other personal identifiers.

31. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

32. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

33. Facebook users can create profiles that include photos, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photos, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as personal occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations at particular dates and times. A particular user's profile page

also includes a "Wall," which is a space where the user and his or her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

34. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when he or she uploaded the file(s). It also provides users the ability to "tag" (i.e. label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos or videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

35. Facebook users can exchange private messages on Facebook and Facebook Messenger with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook and Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

36. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

37. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or

content on third party (i.e. non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

38. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

39. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account until present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

40. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

41. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

42. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

43. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that user's access or use of that application may appear on the user's profile page.

44. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photos, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group numbers; future and past event postings, rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

45. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

46. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contact between the user and the provider's support services, as well as records of any actions taken by the provider or user because of the communications.

47. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, when, where, and how" of criminal conduct under investigation, thus enabling the United States to establish and prove each elements or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other date retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the IP addresses from which users access their accounts along with the date and time. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.

48. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning

14

subscribers and their use of Facebook, such as account access information, transaction information, location information and other account information.

## NON-DISCLOSURE

49. The government is requesting that the Court order that all papers relating to this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation, the nature and scope of which is not public. Premature disclosure of the contents of this warrant and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness. Accordingly, there is good cause to seal these documents.

50. Likewise, the government is applying under 18 U.S.C. Section 2705(b) for an order directing Facebook not to disclose the existence of this search warrant to the subscribers of the Facebook accounts or to any other person for one year.

Kyle Kassa
Task Force Officer, FBI

Sworn to before me this 21st day of October, 2019.

John H. Rich III
United States Magistrate Judge